UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *ex rel.* JAMES PETERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:11CV000902 AGF |
| | ) | |
| SANBORN MAP COMPANY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM AND ORDER**

This *qui tam* action brought under the False Claims Act ("FCA") is before the Court on the motion of the United States to enforce a settlement agreement allegedly reached among the United States, Relator James Peterson, and Defendant Sanborn Map Company, Inc. on certain key aspects of the case, including the settlement amount. The United States asks, alternatively, for the Court to find that the settlement agreement is fair, adequate, and reasonable, pursuant to the FCA, 31 U.S.C. § 3730(c)(2)(B).[1] Defendant Sanborn concurs in the motion of the United States. Relator opposes the motion. The Court held a hearing on December 4, 2013, at which the parties presented argument and exhibits, but no testimony. For the reasons set forth below, the motion to enforce the settlement agreement will be granted.

---

[1] This section provides that in a *qui tam* action, the United States "may settle the action with the defendant notwithstanding the objections of the person initiating the action if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances." 31 U.S.C. § 3730(c)(2)(B).

**BACKGROUND**

Relator is a former vice president and general manager of Defendant. On May 19, 2011, Relator filed a complaint alleging that Defendant violated the FCA by using unapproved subcontractors for digital mapping work performed for the United States Army Corps of Engineers (the "Corps") on three contracts. The three contracts were "Indefinite Delivery Indefinite Quantity" contracts through which 40 "task orders" were issued. Each task order was for a separate project and may have involved multiple subcontractors. The Corps acted as a coordinator for other federal agencies and state and local governments to contract with Defendant. Each of the task orders had independently-negotiated terms in addition to the applicable contract terms from the overriding contracts. The complaint states that over $4.5 million in task orders and over $6.7 million in payments were made to Defendant under the contracts, and that Defendant fraudulently submitted billing to the Government by sending work overseas to unapproved subcontractors in contravention of the contracts, and that Defendant profited from doing so.

The United States intervened in the action on July 31, 2013, and filed the present motion on August 15, 2013.

**Version 1 of Settlement Agreement (Doc. No. 33-8)**

An initial version of a Settlement Agreement was presented to Relator on April 17, 2013. Paragraph 1 reflected a settlement amount of $2.1 million, to be paid by Defendant in installments. Paragraph 2 addressed Relator's share of the settlement proceeds, but left blanks with respect to amounts. Paragraph 4 contained the following release provision as

to claims Relator had against Defendant on behalf of the Government:

> Relator . . . releases [Defendant] from any civil monetary claim the Relator has on behalf of the United States for the Covered Conduct under the False Claims Act, 31 U.S.C. §3729-3733.

Paragraph 6 stated that Relator would not object to the Agreement, and that he agreed and confirmed that the Settlement Agreement was fair, adequate, and reasonable under all the circumstances, pursuant to 31 U.S.C. §3730(c)(2)(B). Paragraph 7, the key paragraph in the present dispute between the parties, contained another release provision, as follows:

> Relator . . . releases [Defendant] . . . from any liability to Relator arising from the filing of the Civil Action, or under 31 U.S.C. §3730(d) for expenses or attorney's fees and costs.

Paragraph 27 provided that the Agreement was effective on the date of the signature of the last signatory.

On April 26, 2013, the United States sent Relator a letter describing why it thought the $2.1 million settlement amount was fair, adequate, and reasonable. The United States wrote that the amount reflected sound public policy by not forcing Defendant into bankruptcy, that there were litigation risks with proceeding forward, and that, after a thorough three-year investigation, all government agencies involved agreed that the settlement amount was appropriate.

By email dated May 6, 2013, Relator stated that he would "not object to a settlement of $2.1 million to fully settle the allegations contained within the *qui tam* lawsuit," and that he anticipated "working toward a signed Settlement Agreement and dismissal of the lawsuit with prejudice." (Doc. No. 33-14.) The parties, however, were

3

unable to reach an agreement with respect to Relator's share of the settlement amount [2] and agreed to remove this matter from the Settlement Agreement and to submit the matter to the Court after an agreement was signed.

**Version 2 of Settlement Agreement (Doc. No. 33-18)**

On May 24, 2013, the United States sent Relator a redlined second draft of the Agreement. Paragraph 7 was unchanged. Consistent with the parties' agreement, Paragraph 2 was changed to state that the United States and Relator "each retain all their rights pursuant to the False Claims Act on the issue of the share percentage, if any, that Relator should receive of any proceeds of the settlement of his claims," and that "no agreements concerning Relator share have been reached to date."

On May 28, 2013, Relator emailed the United States protesting that the new language in Paragraph 2 indicated that Relator might not be entitled to a share at all, when the clear agreement had been that he was entitled to a share and the only dispute being what amount within the statutorily range of recovery he would get. The United States responded that the new version of Paragraph 2 contained the standard model paragraph for use when the Government and a relator share is yet to be determined. Nevertheless, the United States asked Relator to suggest acceptable settlement language on the issue of his share.

By email dated May 30, 2013, Relator maintained that the Agreement should state

---

[2] The FCA, 31 U.S.C.§3730 (d)(1), provides "[i]f the Government proceeds with an action brought by a person under subsection (b), such person shall, subject to the second sentence of this paragraph, receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action."

that the United States agreed "that Relator shall receive at least 15 percent but not more than 25 percent of the proceeds of the settlement." (Doc. No. 33-21.) While the United States was unwilling to accept this language, it offered to write a letter to Relator in which the United States stated that it would not argue that Relator was entitled to less than a 15 percent relator share. By email dated June 11, 2013, Relator agreed to this solution, and added, "with regard to your question regarding any additional concerns with the settlement agreement (Version 2), I will make a final review of this agreement . . . and advise you of our position by the end of the week." (Doc. No. 33-23.)

In response to a subsequent email by Relator with regard to Paragraph 2 and the proposed letter, the United States emailed him on June 18, 2013, as follows, in relevant part:

> The only agreement reached between us is that $2.1 million is a fair, adequate and reasonable settlement amount. There is no agreement with regard to relator share, which is the only other topic for consideration . . . . [P]lease confirm whether or not [Relator] will sign the settlement agreement as it is presently drafted (Version 2). If the answer is no, please specify exactly what language you oppose. If it is just the language in Paragraph 2 referenced in your email today, please indicate that.

(*Id*.)

On June 25, 2013, Relator responded that he did "not oppose the language of the settlement agreement as it is presently drafted (Version 2)." (Doc. No. 33-24.) On June 26, 2013, the United States emailed Relator, "I believe this settles all pending issues. Please let me know if I am wrong about that." *Id*.

**Version 3 of Settlement Agreement (Doc. No. 33-27)**

On July 12, 2013, the United States sent Relator and Defendant a redlined third

5

draft of the Agreement, noting that it did not include any changes specific to Relator, but mainly incorporated changes related to collateral, the promissory note, etc. (Doc. No. 33-27.) The United States emailed Relator on July 16, 2013, to memorialize a telephone conversation on that day regarding Paragraph 7. The United States wrote that it would "contact DOJ and [Defendant] about editing Paragraph 7 to remove the language related to 3730(d)/atty & costs." It proposed the following language for Paragraph 7:

> Relator . . . releases [Defendant] . . . from any liability to Relator arising from the filing of the Civil Action. As of the date of this settlement agreement, expenses for attorney's fees and costs pursuant to 31 U.S.C. §3730(d) have yet to be determined, and Relator is not herein releasing [Defendant] from any obligations which may be required pursuant to 31 U.S.C. §3730(d).

The United States asked Relator to confirm that this language was acceptable, adding that it could not guarantee that DOJ would approve this exact language, but wanted to have Relator's "OK" before submitting it to DOJ, followed by submission to Defendant. (Doc. No. 33-28.)

In a response later that day, Relator recommended a further change to Paragraph 7, changing the first sentence from "Relator . . . releases [Defendant] . . . from any liability to Relator arising from the filing of the Civil Action" to "Relator . . . releases [Defendant] . . . from liability to Relator specific to the Civil Action." (*Id.*)

On July 17, 2013, Relator sent the following email to the Government:

> I have reviewed the language specific to [Defendant]. Just so you understand, we have reached no agreement with [Defendant] nor agreed to any release specific to [Defendant]. We have agreed to dismiss the lawsuit as relator on behalf of the government pursuant to the dismissal previously discussed. Without an agreement with [Defendant], Relator has not agreed to release any claims beyond the required dismissal.

(Doc. No. 33-29).

The next morning, the United States replied asking for clarification, stating that it understood that "the only remaining settlement agreement language issue with relator was with paragraph 7," on which the United States soon expected to have an answer from DOJ that same morning. *Id.*

**Version 4 of Settlement Agreement (Doc. No. 33-30)**

Later on July 18, 2013, the United States sent Relator Version 4 with an accompanying email noting that,

> Paragraph 7 has been modified to parallel the language regarding the unresolved issue of relator share. This makes it very clear that the issue of attorney fees/costs has not yet been determined and is not released or waived. The balance of Paragraph 7 remains intact using the language to which you previously agreed on June 25.

(Doc. No. 33-30.) Thus, Paragraph 7, as modified, read as follows:

> Relator . . . releases [Defendant], and its officers, agents, and employees, from any liability to Relator arising from the filing of the Civil Action. [Defendant and] Relator . . . agree that they each retain all of their rights pursuant to the False Claims Act on the issue of reasonable expenses, attorneys' fees and costs under 31 U.S.C.§3730(d), if any. No agreement concerning reasonable expenses, attorneys' fees and costs incurred has been reached to date.

*Id.* Relator was asked to confirm that the document reflected all necessary modifications.

On July 19, 2013, the United States emailed Relator expressing concern that Relator was now "attempting to modify language to which [Relator had] already agreed." The email stated the following:

> On June 25 you approved of the language of the settlement document. Since this point, there have been no changes to any language of the

7

settlement document which pertain to relator . . . .

> When [Relator's counsel] called me [on July 16, 2013] to let me know that relator and [Defendant] have not agreed on an attorney fee/cost amount (and therefore paragraph 7 needed to be revised), I immediately began working on this modification. However, any change related to attorney fees/costs does not impact other language to which you have already agreed. On June 25 you agreed to the language of paragraph 7 which included release language and the language concerning attorney fees and costs. The release language to which you have already agreed must remain.
>
> * * *
>
> Please reply in writing. Specify (clearly answering yes or no) whether you and your client will sign [Version 4 of the Agreement]. If the answer is no, clearly state the exact reasons and language which is now problematic.

(Doc. No. 33-37.)

Later that day, Relator replied, stating that Relator had never agreed to the release language in Paragraph 7:

> [Paragraph 7] contemplates resolution of the attorneys' fees issue and other potential side agreements between Relator and [Defendant]. . . . [T]his has not occurred… Relator has preserved and has never agreed to release [Defendant] from any other claim not stated in the Complaint, including other possible *qui tam* or wrongful termination claims. . . . [T]here is no applicable release language for inclusion in the settlement agreement. . . . Once we resolve the language issues . . . , we will execute the settlement agreement and dismiss the case pursuant to the dismissal process discussed therein.

(Doc. No. 33-38.)

**Version 5 of Settlement Agreement (Doc. No. 23-1)**

On July 23, 2013, the United States sent out Version 5 of the Agreement. Paragraph 7 read:

> Relator . . . releases [Defendant] . . . from any liability to Relator arising from the filing of the Civil Action. [Defendant and] Relator . . . agree that

8

they each retain all their rights pursuant to the False Claims Act on the
issue of reasonable expenses, attorneys' fees and costs under 31 U.S.C.§
3730(d), if any. No agreement concerning reasonable expenses, attorneys'
fees and costs incurred has been reached to date.

In the accompanying email, the United States stated:

Relator clearly agreed to the language of paragraph[] 7 . . . on June 25 . . . .
The language of these paragraphs has been in every draft provided to
Relator since then.

(Doc. No. 33-40.)

The United States emailed Relator again on July 25, 2013, responding to an email from the previous evening that is not in the record. The United States noted that its comments on July 16, 2013 ("It was my understanding that the only remaining settlement agreement language issue with relator was with paragraph 7.") were directed only to the part of Paragraph 7 relating to the issues of attorneys' fees and costs, and not to the scope of release of claims. The United States wrote that at that point (July 16, 2013), the language simply needed to be modified to indicate that the parties had not agreed on attorneys' fees and costs. The United States pointed out that "[w]hether or not [Relator] and [Defendant] can agree on a reasonable attorney fees/costs amount is a completely separate issue to the Statement of Release [in Paragraph 7]." While maintaining that Relator had already agreed to the language in Version 5 of the agreement, the United States asked "exactly what language in the final settlement agreement Relator claims he does not agree to," the "exact language to which Relator would agree," and whether "if these problems are resolved, Relator will sign the settlement agreement." (Doc. No. 33-41.)

9

On the same day, Relator responded that he would agree to Paragraph 7 if the first sentence stated, "Relator . . . releases [Defendant] . . . from any liability specific to the allegations contained within the instant Civil Action." (Doc. No. 33-42.) Still maintaining that the Agreement was already enforceable, the United States nonetheless proposed the language to Defendant. Defendant in turn proposed the following release language: "Relator . . . releases [Defendant] . . . from any liability arising from the Covered Conduct or the Civil Action." (Doc. No. 33-43.) Relator insisted on its own proposed language, which it noted was the same language used in a version of the Agreement that was discussed in May.

In an email dated August 1, 2013, the United States summed up the situation as follows:

> [I]t appears we are at an impasse. [Relator demands] changes to the Scope of Release language of Paragraph 7. [Defendant] will not agree to those changes. The Government and [Defendant] both believe the agreement is a final settlement agreement previously agreed to by all parties. Therefore, in light of the impasse, the Government will proceed forward with filing [the] appropriate pleadings.

(Doc. No. 33-45.) Relator's August 2, 2013 reply stated:

> Relator is unwilling to reach any further agreements until Relator's required release language is agreed to by all parties. If agreement and a complete meeting of the minds is not reached on all remaining issues by next Friday, August 9, 2013, Relator withdraws all offers of compromise and settlement and intends to proceed with litigation with or without Government intervention.

(Doc. No. 33-46.)

On August 15, 2013, the United States filed the present motion to enforce Version 5 of the Settlement Agreement, which has been executed by both the United States and Defendant.

**ARGUMENTS OF THE PARTIES**

The United States argues that this Court should enforce the final version of the settlement agreement because Relator agreed to it, including the scope of release language in Paragraph 7, on June 25, 2013. The United States notes that this is the same scope of release language that has been in every draft of the agreement since April 2013. The United States argues that Relator cannot rescind his agreement because he changed his mind about the scope of release language to which he already agreed.

The United States argues that, alternatively, this Court should approve the final version of the Settlement Agreement because the settlement is fair, adequate, and reasonable. The United States states that it conducted a three-year investigation, and believes the settlement is in its best interest and avoids costly litigation. The United States also approved payments over time instead of the normal requirement of immediate payment. Further, the United States argues that the settlement is rationally related to a legitimate government purpose "to resolve the lawsuit at the earliest stages of litigation through a fair, adequate and reasonable settlement amount while not risking a lower monetary award after expensive, contentious and time-consuming litigation."

Relator argues that the communications and negotiations between Relator and the United States indicate that the parties did not reach an enforceable agreement on June 25, 2013, or anytime thereafter. Relator maintains that his email of June 25, 2013, upon

which the United States relies, was in the context of the discussion with the United States on Paragraph 2 of Version 2 of the Agreement related to the Relator's share, and was not a binding acceptance of all other terms in Version 2. Relator argues that the United States' response on June 26, 2013, ("I believe this settles all pending issues. Please let me know if I am wrong about that.") indicates that the acceptance was ambiguous.

Relator also argues that Version 5 is not enforceable because he never signed it, as required by Paragraph 26, which remained intact from the initial draft. Relator argues that presuming there is an enforceable settlement, Paragraph 7 is invalid or unenforceable as to Relator because the release language in Paragraph 4 is more specific. He also argues that because there has not been an agreement regarding attorneys' fees, there is no consideration for the release language in Paragraph 7.

## **DISCUSSION**

Settlement agreements are favored by the courts, and where the terms are unambiguous, a federal district court has inherent authority to enforce a settlement agreement entered into by the parties in a pending case. *Harper Enters., Inc. v. Aprilia World Serv. USA, Inc.*, 270 F. App'x 458, 460 (8th Cir. 2008). "Once parties have settled a dispute and have agreed to settlement terms, the parties cannot rescind it." *Allen v. Nevin Waters, D.D.S., PC*, 4:11CV01255 AGF, 2012 WL 1745550, at *1 (E.D. Mo. May 16, 2012), *aff'd,* 498 F. App'x 669 (8th Cir. 2013). A party cannot avoid an otherwise enforceable settlement agreement merely because he later changes his mind. *Shields v. Potter*, 80 F. App'x, 541, 541 (8th Cir. 2003).

Basic principles of contract law govern the enforcement of a settlement agreement.

12

*Chaganti & Assocs., P.C. v. Nowotny,* 470 F.3d 1215, 1221 (8th Cir. 2006) (citations omitted). Under Missouri law, a party seeking specific performance of a settlement agreement bears the burden of demonstrating the existence of the agreement by clear, convincing, and satisfactory evidence. *Vulgamott v. Perry,* 154 S.W.3d 382, 388 (Mo. Ct. App. 2004).

A settlement can be "valid and enforceable even if some terms may be missing or left to be agreed upon as long as the essential terms are sufficiently definite to enable the court to give them exact meaning." *Owen v. Hankins*, 289 S.W.3d 299, 304 (Mo. Ct. App. 2009) (citation omitted).

Here, the United States has demonstrated by clear and convincing evidence that Relator agreed to the scope of release language in Paragraph 7, on June 25, 2013. Since that time, although the language in Paragraph 7 related to attorney's fees was amended by agreement of the parties, the release of claims language was not and Relator is now bound to comply with that agreement.

The Court finds unpersuasive Relator's characterization of its June 25, 2013 acceptance as merely related to the issue of Relator's share. As set forth above, the June 25, 2013 statement of acceptance was in response to the United States' question as to whether Relator would sign Version 2, and following Relator's own email on June 11, 2013, that he would review the entire Version 2 and get back to the United States on any additional concerns he may have. In assessing whether an enforceable settlement agreement exists, this Court "looks to the intention of the parties as expressed or manifested in their words or acts." *Anglin Eng'g Co. v. J.E. Barry Co.*, 912 S.W.2d 633,

638 (Mo. App. E.D. 1995).

Relator correctly points out that the continuation of negotiations and exchange of drafts can indicate an agreement has not been reached. *See BP Prods. NA, Inc. v. Wallis Petroleum, L.C.*, No. 4:06CV01110 ERW, 2007 WL 1240261 (E.D. Mo. Apr. 27, 2007). But, here, negotiations subsequent to June 25, 2013, did not relate to the scope of release language in Paragraph 7 which relator had accepted. Nor did Relator indicate that his acceptance of the release language in Paragraph 7 was conditioned on a resolution with Defendant as to the amount of attorney's fees.

The parties' agreement to modify the attorneys' fees release does not nullify other language to which the parties had already agreed. Under Missouri law, "[g]enerally, contracts may be modified as to particular provisions or have new terms engrafted thereon, yet stand as to the residue of the original agreement." *Kells v. Mo. Mountain Props., Inc.*, 247 S.W.3d 79, 84 (Mo. Ct. App. 2008) (citation omitted). The Court concludes that the scope of release language at the beginning of Paragraph 7 that Relator later sought to change was independent of and outside the scope of the parties' agreement to modify Paragraph 7 with respect to fees and costs. Thus, the Government was free to reject Relator's offer to change the beginning of Paragraph 7, and Realtor remains bound by his previous agreement thereto.

The Court does not consider the United States' June 26, 2013 response to Relator's acceptance of Version 2 as a call for clarification that would render acceptance ambiguous. And the Court rejects Relator's argument that the release language in Paragraph 4 of Version 5 of the Agreement is controlling because it is more specific than

14

the language in Paragraph 7. Paragraphs 4 and 7 deal with two different releases. Paragraph 4 releases Defendant from claims Relator may have "on behalf of the United States for the Covered Conduct under the [FCA]"; Paragraph 7 releases Defendant from liability "arising from the filing of the Civil Action" *i.e.*, non-*qui tam* claims Relator may have.

The Court also rejects Relator's contention that the release fails for lack of consideration. No change was made to the language at issue following Relator's agreement. And over all, the parties agreed to submit the issue of Relator's share and fees and costs to the Court, and the United States further agreed not to argue that Relator was entitled to less than fifteen percent.

**Approval of the Settlement Agreement Between the United States and Defendant**

The Court concludes that the alternative argument raised by the United States for enforcement of the final version of the Settlement Agreement is without merit. It is true that in an action under the FCA, the United States is the real party in interest because of its significant control over the course of the litigation and its dominant share of the proceeds thereof. *United States ex rel. Zissler v. Regents of the Univ. of Minn.*, 154 F.3d 870, 872-73 (8th Cir. 1998). It is also true that the United States "may settle the action with the defendant notwithstanding the objections of the person initiating the action if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances," 31 U.S.C.§3730(c)(2)(B). Here the Court believes that the settlement amount and payment plan are fair, adequate, and reasonable. But the United States (and Defendant) are asking the Court to further approve a release

provision they have agreed on that affects the rights of Relator with respect to future liability of Defendant to Relator. This the Court cannot do.

## **CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that the United States' motion for enforcement of Version 5 of the settlement agreement is **GRANTED**. (Doc. No. 22.)

**IT IS FURTHER ORDERED** that within 14 days from the date of this Order, Relator shall submit his fees request, along with documentation. Defendant shall have seven days thereafter to object.

**IT IS FURTHER ORDERED** that within 14 days from the date of this Order, the parties shall submit briefs on the question of what Relator's share should be under 31 U.S.C.§3730 (d)(1). Each party shall have seven days from such submissions to respond thereto.

_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 4th day of February, 2014.